**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DORIS STERLING,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 C 6280** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **WEXFORD HEALTH SOURCES, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Doris Sterling brings this suit under 28 U.S.C. § 1983, alleging that Defendant Wexford Health Sources Inc., a state contractor that provides medical services to incarcerated individuals, was deliberately indifferent to his medical needs in violation of the Eighth Amendment. Sterling argues that Wexford failed to promptly provide him with necessary cardiac care, including a diagnostic procedure called a coronary angiogram, after a blood clot was discovered in his lung. That treatment was delayed, Sterling says, because Wexford elevates financial considerations over questions of medical need and routinely ignores recommendations that doctors make for offsite care. On summary judgment, Wexford contends that Sterling has not established that he suffered any constitutional harm. Wexford urges, further, that Sterling has not established the kind of policy or practice needed to subject a contractor such as Wexford to liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Wexford's motion is granted for the reasons explained below.

## PROCEDURAL HISTORY

For the early procedural history of this case, the court directs readers to its Order of March 25, 2019 [79]. After the parties completed an initial round of discovery, Wexford filed a motion for summary judgment on July 31, 2020 [122]. When Sterling filed his Local Rule 56.1 statement of additional facts, he attached as an exhibit a contract between Wexford, the Illinois Department of

Corrections ("IDOC"), and the Illinois Department of Healthcare & Family Services [135-1]. This document (the "Contract") had not been disclosed or produced in discovery. Wexford moved to strike it for untimeliness and lack of foundation, and it requested, in the alternative, that discovery be reopened [140]. On November 25, 2020, the court reopened discovery [148]. Wexford's renewed motion for summary judgment, filed earlier this year, is ready for decision.

## BACKGROUND[1]

### I. Wexford's Contract with IDOC

Sterling is an inmate of IDOC who was incarcerated at all relevant times at Stateville Correctional Center. (Def. Wexford Health Sources Inc.'s Am. Rule 56.1 Statement of Undisputed Facts [163] (hereinafter "Def.'s SOF") ¶ 1.) Wexford is a private corporation that contracts to provide medical services at IDOC facilities, including Stateville. (Id. ¶ 2; Pl.'s L.R. 56.1(b)(3) Statement of Additional Material Facts [170] (hereinafter "Pl.'s Add. SOF") ¶ 23.)

The Contract sets out terms on which Wexford provides medical care at Stateville.[2] (See Def.'s SOF ¶¶ 2, 69, 71–72, 74; Pl.'s Add. SOF ¶¶ 23–30; Ex. A to Pl.'s Add. SOF [173]

---

[1]      The facts set forth below come from Wexford's Local Rule 56.1 statement of material facts [163], Sterling's Local Rule 56.1 statement of additional material facts [170], and the exhibits accompanying those statements.

[2]      Much of the evidence about the Contract comes from the deposition testimony of Nickolas Little, one of Wexford's Rule 30(b)(6) witnesses. (See Def.'s SOF ¶¶ 69–80.) Although the transcript of that deposition should be Exhibit 9 to Wexford's Local Rule 56.1 statement, Wexford neglected to file the document with its other exhibits.

Wexford makes two general objections to Sterling's assertions about the Contract. First, Wexford disputes the notion that the Contract "governs" the medical services provided to inmates in IDOC facilities. (Wexford's Resp. to Pl.'s Rule 56.1(b)(3) Statement of Additional Material Facts [178] (hereinafter "Def.'s Add. SOF Resp.") ¶¶ 23–25.) Whatever the significance of the word "govern," the court recognizes that the Contract does not entirely dictate how Wexford provides medical care at Stateville and that the Contract terms do not "replace the independent medical judgment of Wexford providers." (Def.'s SOF ¶¶ 75–76.)

Second, Wexford contends that "any reference to the contract is immaterial as Plaintiff cites to no evidence that compliance with any contract term caused or contributed to any injury Plaintiff claims to have suffered." (Id. ¶¶ 23–30.) Wexford is correct that if Sterling relies on the

(hereinafter "Wexford–IDOC Contract") § 2.)  At a high level, Wexford agrees under the Contract to provide any services necessary for an inmate's healthcare.  (Def.'s SOF ¶ 71.)  More specifically, the Contract makes Wexford "responsible for providing safe and cost-effective on-site medical services," and states that "[o]ff-site services [are] reserved for specialty and emergency care that cannot be provided on site."  (Wexford–IDOC Contract § 2.2.2; *see also* Pl.'s Add. SOF ¶ 24.)  In a similar vein, the Contract requires Wexford to "operate the medical . . . program in a cost effective manner" (Wexford–IDOC Contract § 2.2.2.2; *see also* Pl.'s Add. SOF ¶ 25), and to "[a]ggressively manage all off-site services for appropriate utilization and cost effectiveness" (Wexford–IDOC Contract § 2.2.2.15; *see also* Def.'s Add. SOF Resp. ¶ 26).  And the Contract requires Wexford to conduct "active utilization review of all hospitalized offenders to achieve the return of the offender to the institution at the earliest and safest time."[3]  (Wexford–IDOC Contract § 2.2.3.6; *see also* Def.'s Add. SOF Resp. ¶ 27.)

The Contract allows Wexford to refer Stateville inmates to the University of Illinois Medical Center at Chicago ("UIC") for certain medical services—including, for example, coronary angiograms—at no cost to Wexford.[4]  (Wexford–IDOC Contract § 2.2.3.7(a); *see also* Def.'s Add. SOF Resp. ¶ 28; Def. Wexford Health Sources Inc.'s Reply to Pl.'s Resp. to Def.'s Rule 56.1 Statement of Undisputed Facts [174] (hereinafter "Def.'s SOF Reply") ¶¶ 53–54; *see also* Dep. of

---

Contract in support of his *Monell* argument, he must establish a causal connection between the Contract and his injury; Wexford's objection to references to the Contract is otherwise overruled.

[3]  Wexford objects to Sterling's reference to this provision, stating that it "denies that the cited reference supports the stated fact."  (Def.'s Add. SOF Resp. ¶ 27.)  This objection is overruled; although Sterling did not use quotation marks, the court notes that he directly quoted from the Contract.

[4]  The Contract does not prohibit Wexford from sending a patient to hospitals other than UIC.  (Def.'s SOF ¶ 70.)  However, Wexford and IDOC "prefer that certain services be performed at UIC because of a long-standing relationship" between UIC and IDOC.  (*Id.* ¶ 31.)  For example, "UIC has a holding cell in the facility that accommodates certain security concerns, and it is a university hospital that is clinically equipped to handle difficult cases with a greater variety of techniques."  (*Id.*)

Arthur Funk, Ex. 7 to Def's SOF [164] (hereinafter "Funk Dep.") 60:6–16.)  Sterling contends, however, that the Contract includes terms that discourage Wexford providers from making such referrals.   In fact, the Contract does not set a hard cap on the number of referrals that Wexford can make from Stateville (or other facilities) to UIC.  (Def.'s SOF ¶ 77.)  But the Contract does establish default, annual maximums of inpatient and outpatient referrals that Wexford may make from five specified facilities (including Stateville) to UIC, and it states that those maximums "shall not" be exceeded "unless approved in advance by [UIC] and the IDOC Medical Director." (Wexford–IDOC Contract § 2.2.3.7(b); *see also* Def.'s Add. SOF Resp. ¶ 28.)  If Wexford "over utilizes stays/visits during a year," then, according to the Contract, a system of "[c]ompensation adjustment" will take effect.   (Wexford–IDOC Contract § 2.2.3.7(b); *see also* Def.'s Add. SOF Resp. ¶ 28.)  Specifically, the Contract imposes on Wexford a "performance adjustment" in the amount of "$5,000 . . . for each occurrence beyond the predetermined average limits for visits." (Wexford–IDOC Contract § 3.9.3(g); *see also* Def.'s Add. SOF Resp. ¶ 29.)

Wexford exceeded the target maximum of outpatient referrals to UIC (2,160) during at least two years about which its Rule 30(b)(6) witness testified.  (Pl.'s Add. SOF ¶ 31.)  Wexford exceeded the target maximum of inpatient referrals to UIC (216) during at least six or seven such years.  (*Id.* ¶ 32.)  However, Wexford's compensation under the contract was never adjusted because of those excesses.  (Def.'s SOF ¶¶ 78–79.)

## II.    Wexford's Policies and Practices

Wexford "promulgates various policies and procedures" that bear on its day-to-day operations for providing medical care at Stateville.  (*See* Def.'s SOF ¶ 58.)  For example, Wexford makes decisions about off-site care (such as referrals to UIC) through a process known as collegial review.  (*Id.* ¶ 73.)  Collegial review takes place during a regularly-scheduled conference call between, at a minimum, Wexford's corporate director of utilization management and Stateville's medical director (or the director's designee).  (*Id.* ¶ 26.)  During such a call, the Stateville representative typically would seek approval to have an inmate referred for an off-site

procedure. (*Id.* ¶ 26.) After discussing the proposal, the group either approves or disapproves the proposed referral and, if applicable, develops an alternative treatment plan for the inmate. (Dep. of Neil Fisher, Ex. 8 to Def's SOF [164] (hereinafter "Fisher Dep.") 15:9–16:12.)

A proposed off-site referral will be considered during collegial review only if an on-site Stateville provider requests it. (*See* Fisher Dep. 21:22–22:5, 23:2–6.) Thus, if one outside specialist treats a Stateville inmate and recommends that the inmate receive some future off-site procedure, that recommendation will not necessarily enter collegial review. Wexford's on-site medical staff members will "review[], integrate[], and generally defer[] to" the outside specialist's recommendation, but they are "expected to determine the appropriate course of treatment based on their own review of the findings." (Def.'s SOF ¶ 51.) Stated more broadly, neither the Contract nor any of Wexford's corporate procedures—nor a recommendation by an outside doctor— "replace[s] the independent clinical judgment of medical providers" employed by Wexford at Stateville. (*Id.* ¶ 58; *see also id.* ¶¶ 75–76.)

### III.    Sterling's Cardiac Care

Sterling was admitted to Presence St. Joseph Medical Center ("Presence") on November 13, 2013, after being found unresponsive at Stateville. (*Id.* ¶ 11.) At Presence, he was evaluated by Dr. Mary Gordon, who is board-certified in internal medicine and cardiology. (*Id.* ¶ 12.) Dr. Gordon treated and monitored Sterling for several days before he was discharged on November 18. (*Id.* ¶¶ 14–18.)

Because Sterling was experiencing shortness of breath, Dr. Gordon ordered a pulmonary angiogram. (*Id.* ¶ 13.) A pulmonary angiogram is an X-ray contrast study of the blood flow in a person's lungs. (*Id.* ¶ 9.) That procedure revealed a "large saddle embolus," or a blood clot straddling Sterling's pulmonary arteries on the right and left sides. (*Id.* ¶ 13.) Before discharging Sterling back to Stateville, Dr. Gordon initiated "medical therapy" by prescribing several drugs to treat his "presumed" coronary disease. (*Id.* ¶ 17; Dep. of Mary N. Gordon, Ex. 6 to Def's SOF

[164] (hereinafter "Gordon Dep.") 28:14–29:11; *see also* Ex. 6 to Gordon Dep. (Dr. Gordon's November 18 discharge summary).)

Dr. Gordon wrote daily notes while she treated Sterling at Presence. (*See* Def.'s SOF ¶¶ 14–18; Exs. 1–6 to Gordon Dep.) Each party quibbles with how the other one has described these notes and Dr. Gordon's related deposition testimony. (*See* Def.'s SOF Reply ¶¶ 14–18.) At a minimum, the parties agree that Dr. Gordon recommended that Sterling receive a coronary angiogram "at some point."[5] Specifically, on November 15, after Dr. Gordon discovered the large saddle embolus, she wrote that Sterling "is going to require angiography at some point in the near future." (*Id.* ¶ 14; *see also* Ex. 3 to Gordon Dep.) The following day, she reiterated that Sterling "is going to require delineation of his coronary arteries [i.e., a coronary angiogram] at some point." (Ex. 4 to Gordon Dep.; *see also* Def.'s SOF Reply ¶ 16; Pl.'s Add. SOF ¶ 7.) On November 17, she again stated that Sterling "will require coronary arteriography [i.e., a coronary angiogram] at some point in the future." (Ex. 5 to Gordon Dep.; *see also* Def.'s SOF Reply ¶ 17.) Finally, in Dr. Gordon's November 18 discharge report, she noted that Sterling "will require outpatient cardiology follow up ASAP with the cardiology clinic a[t] UIC for scheduling of a coronary angiogram as soon as he is able to lie flat." (Ex. 6 to Gordon Dep.; *see also* Def.'s SOF ¶ 18; Pl.'s Add. SOF ¶ 8.)

The parties argue over two main points related to that recommendation: (1) the reason why Dr. Gordon believed that a coronary angiogram was necessary, and (2) the reason why she nevertheless did not order that the procedure take place before Sterling was discharged from Presence. On the first point, the parties' presentation of the evidence has been needlessly combative. (*See, e.g.*, Pl.'s Resp. to Def.'s Rule 56.1 Statement of Undisputed Facts [168] (hereinafter "Pl.'s SOF Resp.") ¶¶ 14, 16; Def.'s SOF Reply ¶¶ 14, 16.) In summary, Dr. Gordon

---

[5]     A coronary angiogram is a diagnostic procedure that evaluates the arteries supplying blood to a person's heart and detects any blockages, among other issues. (Def.'s SOF ¶ 10.). It is like a pulmonary angiogram—the procedure Sterling did receive while he was in Dr. Gordon's care—but it focuses on the heart instead of the lungs.

recommended a coronary angiogram because Sterling showed multiple "risk factors for coronary disease":  He had elevated levels of troponin (a type of protein found in the heart); he showed differing results in successive electrocardiogram (EKG) tests; and he was diabetic.  (*See* Gordon Dep. 22:3–10, 30:14–18, 31:14–32:3, 34:14–35:5; *see also id.* at 14:18–15:15 ("[H]aving changes from one EKG to the next is a red flag.").)  The parties agree that those three rationales motivated Dr. Gordon's recommendation that Sterling receive a coronary angiogram.  (*See* Pl.'s SOF Resp. ¶¶ 14, 16–17; Def.'s SOF Reply ¶¶ 14, 16–17.)

The reasons that Dr. Gordon nevertheless did not have a coronary angiogram performed while Sterling was still at Presence are slightly more complicated.  In her deposition testimony, Dr. Gordon presented "[t]wo reasons" for her decision not to have an angiogram done at Presence.  (Gordon Dep. 29:13–30:5.)  First, because of breathing issues that Sterling was experiencing, he could not yet lie flat in the manner required for a coronary angiogram.  (*Id.* at 23:21–24:5, 27:8–17; *see also* Def.'s SOF Reply ¶¶ 15, 17–18.)  Second, according to Dr. Gordon's contemporaneous notes, she had been "told by [Wexford] they prefer to have [Sterling] transferred to [UIC] for [a coronary angiography] to be done."  (Ex. 3 to Gordon Dep. (November 15 notes); *see also* Ex. 4 to Gordon Dep. (similar language in November 16 notes).)  In her deposition, Dr. Gordon clarified what she meant:  She believed that Stateville's "prison doctors and warden have final say over what medical treatment is done for patients who are prisoners" (Gordon Dep. 29:13–30:5), and she believed that Stateville "had a contract with UIC because they were both state institutions."  (*Id.* at 22:14–23:2.)  The parties criticize one another's characterizations of this testimony, but they agree that Dr. Gordon cited these two rationales— that is, (1) Sterling's inability to lie flat, and (2) Wexford's policies and preferences—for her decision not to have a coronary angiogram performed while Sterling was still at Presence.  (*See* Pl.'s SOF Resp. ¶¶ 15, 17–18; Def.'s SOF Reply ¶¶ 15, 17–18.)

Before Dr. Gordon discharged Sterling from Presence, she spoke with various Wexford medical personnel.  (Def.'s SOF ¶ 19; Pl.'s Add. SOF ¶ 11.)  Those individuals included

Stateville's medical director and Wexford's corporate director of utilization management. (Def.'s SOF ¶¶ 19, 23, 29; Pl.'s Add. SOF ¶ 11.) Some of those individuals assured Dr. Gordon that Sterling would be evaluated at the UIC cardiac clinic. (Def.'s SOF ¶ 19; Pl.'s Add. SOF ¶ 11.)

After Sterling was discharged from Presence, he was admitted to the Stateville infirmary, where he was tested for his anticoagulation level, administered medications, and monitored for symptoms. (Def.'s SOF ¶ 22.) Per Wexford policy, medical personnel at Stateville would have reviewed Sterling's updated medical records when he returned from Presence.[6] (Def.'s SOF Reply ¶ 20.) They were also required to formulate a plan of care that integrated Sterling's existing course of treatment at Stateville with the information contained in the new records from Presence. (Def.'s SOF ¶ 21.)

Contrary to Dr. Gordon's expectation that Sterling would be evaluated at UIC's cardiac clinic, there is no evidence that Sterling saw another cardiologist for approximately 16 months, when he was treated by another cardiologist at Presence, Dr. Robert Elgar, on March 17, 2015. (*Id.* ¶ 34.) Dr. Elgar examined Sterling and reviewed his medical records, including those reflecting the large saddle embolus that Dr. Gordon had detected. (*Id.*) Dr. Elgar did not detect any ischemic symptoms, or reduced blood flow. (Gordon Dep. 57:15–23.) And he did not recommend a coronary angiogram. (Def.'s SOF ¶ 34.) A few months later, on both July 16 and December 30, Sterling was treated by a hematology–oncology physician at UIC. (Def.'s SOF Reply ¶ 37.) That doctor did not refer Sterling to a cardiologist or order a coronary angiogram. (*Id.*)

At some point in 2015, Sterling did undergo another pulmonary (not coronary) angiogram. (Def.'s SOF ¶ 41.) That procedure revealed that his large saddle embolus had resolved itself, seemingly having broken down and been reabsorbed by his body. (*Id.*) At no point in this series

---

[6] The court uses conditional language intentionally here. These facts derive from testimony that a Rule 30(b)(6) designee gave about standard Wexford procedures. He did not testify to his personal knowledge about how Sterling's records were actually reviewed.

of events did Sterling ever receive a *coronary* angiogram as Dr. Gordon had recommended in November 2013.  (Pl.'s Add. SOF ¶ 21.)  Nor is there evidence that a proposal for this procedure was considered during Wexford's collegial review.  (*See* Def.'s SOF Reply ¶ 27; Def.'s Add. SOF Resp. ¶ 20.)

The parties dispute whether it was medically appropriate for Sterling not to have a coronary angiogram at any time between November 2013 and March 2015.  Sterling points to the three indicators that Dr. Gordon had identified when she recommended the procedure: his elevated levels of troponin, the fluctuations between his successive EKG tests, and his diabetes.  (Pl.'s Add. SOF ¶¶ 1–5, 9; Pl.'s SOF Resp. ¶¶ 42, 48.)  Sterling believes that those indicators were also present at the time of his hematology–oncology appointment in July 2015, but Wexford disputes that interpretation of the record.  (*See* Pl.'s SOF Resp. ¶¶ 42, 48 (citing Gordon Dep. 48:16–49:4); Def.'s SOF Reply ¶¶ 42, 48.)  Sterling also points to Dr. Gordon's testimony that she was not aware of any particular reason why Sterling would not be given a coronary angiogram once he was able to lie flat.  (Pl.'s Add. SOF ¶ 17.)

Wexford counters by citing Dr. Gordon's deposition testimony that it would have been reasonable for a similarly situated cardiologist not to order a coronary angiogram on the same set of facts.  (Def.'s SOF ¶¶ 44, 77.)  Wexford also argues that Sterling's obesity and his anticoagulation medicine could have created technical problems during a coronary angiogram and increased the risk of complications from the procedure.  (*Id.* ¶¶ 32–33.)  Finally, Wexford emphasizes the fact that a coronary angiogram was not found to be warranted in 2015.  In Wexford's view, that 2015 finding necessarily means that a coronary angiogram was *also* not warranted in 2013, because the possible underlying condition at issue, coronary blockage, would likely have advanced by the later date if it had been present on the earlier date.  (*Id.* ¶ 39 (citing Funk Dep. 39:15–40:19).)

9

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

## DISCUSSION

Sterling contends that Wexford treated him with deliberate indifference in violation of his Eighth Amendment rights. As an initial matter, Sterling must of course prove that he suffered a constitutional deprivation. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Because Wexford is a corporation, however, Sterling must satisfy the additional requirements of *Monell*. He must specifically challenge conduct that is "properly attributable" to Wexford itself, such as an official policy, a widespread practice, or the action of a final policymaker. *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021), *cert. denied*, No. 21-414, 2021 WL 4733651 (U.S. Oct. 12, 2021). He must establish that this corporate conduct, and not merely the actions of individual Wexford employees, was the "moving force" behind the constitutional deprivation. *See J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc), *cert. denied*, 141 S. Ct. 1125 (2021). And, finally, he must show that Wexford's

conduct, in whatever form it takes, reflects the "requisite degree of culpability" on the part of Wexford. *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

Sterling has failed at the threshold of his § 1983 claim because he has not established a constitutional deprivation. He has also failed to satisfy the requirements of *Monell* because he has not proven that he was harmed as a result of a policy or practice that reflects deliberate indifference by Wexford. The court addresses, below, these independently sufficient reasons for granting summary judgment in favor of Wexford.

**I.      Eighth Amendment Deliberate Indifference**

  **A.      Legal Principles**

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety" of incarcerated individuals. *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prison officials violate the proscription against cruel and unusual punishment "when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners." *Jones v. Mathews*, 2 F.4th 607, 612 (7th Cir. 2021) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997)). When an incarcerated individual alleges deliberate indifference, a court must conduct a two-step analysis, which involves one objective and one subjective component.

First, the court asks whether the plaintiff "suffered from an objectively serious medical condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016). A medical condition is considered objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019).

Second, the court asks whether the medical provider was "deliberately indifferent to that condition." *Petties*, 836 F.3d at 728. A prison official acts with deliberate indifference if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. A plaintiff need not show that "the official intended harm or believed that harm would occur," but

neither ordinary negligence nor recklessness is enough. *Petties*, 836 F.3d at 728. In general, "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). Plaintiffs usually rely on circumstantial evidence to establish a "sufficiently culpable state of mind." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (quoting *Farmer*, 511 U.S. at 834). Compelling circumstantial evidence might include a "decision to ignore a request for medical assistance," a "refus[al] to take instructions from a specialist," or an "inexplicable delay in treatment which serves no penological interest." *Petties*, 836 F.3d at 729–30.

Although courts have primarily articulated the principles of deliberate indifference in the context of individual conduct, the Seventh Circuit has made clear that a corporation can also act with deliberate indifference—and that it "might be liable even if its individual agents are not." *Glisson*, 849 F.3d at 378. In short, as discussed more fully below, "if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.* at 378–82 (corporate failure to create policies for coordinating care within or across institutions); *see also, e.g.*, *J.K.J.*, 960 F.3d at 377 (corporate failure to detect and prevent sexual abuse of inmates by guards).

There is a final, crucial requirement for a claim like Sterling's. A plaintiff who alleges that necessary medical assistance was delayed must also "offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). This medical evidence need not take the form of expert testimony, but it must "assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). "[E]vidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Liefer*, 491 F.3d at 715.

### B. Application

Sterling alleges two main deficiencies in the medical care Wexford provided: (1) the failure to perform a coronary angiogram or at least seriously consider such a procedure, and (2) the failure to send Sterling to another cardiac specialist more promptly after his treatment by Dr. Gordon at Presence. (*See* Pl.'s Br. at 4–8.) Although Sterling does not carefully explain which failure is at play, he asserts that he was "needlessly put at risk of further heart damage" by Wexford's inaction. (*Id.* at 5.) In his view, "Wexford has provided no explanation for the almost two-year delay in sending Sterling to a cardiologist . . . ." (*Id.* at 6.) Sterling also asserts (contrary to the caselaw noted above) that "[t]his delay alone is sufficient to find that Wexford's conduct was deliberately indifferent." (*Id.*)

Wexford has not taken aim at the objective component of Sterling's deliberate indifference claim, and the court finds that it has been satisfied. A medical condition is considered objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett*, 937 F.3d at 1023. After Dr. Gordon discovered Sterling's large saddle embolus and recognized that Sterling showed multiple "risk factors for coronary disease" (Gordon Dep. 30:14–18), she repeatedly noted that Sterling would "require" a coronary angiogram or other outpatient cardiac care. (*See* Exs. 3–6 to Gordon Dep.) That diagnosis is enough to establish an objectively serious medical condition.

To satisfy the subjective component of the deliberate indifference test, Sterling must, as explained above, show first that Wexford policymakers "kn[ew] of and disregard[ed] an excessive risk" to his health or safety. *Farmer*, 511 U.S. at 837. He must also show that the delay in treatment was detrimental. *Liefer*, 491 F.3d at 714–15. Because Wexford is a corporate entity, not an individual, the first inquiry boils down to the question of whether Wexford's "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson*, 849 F.3d at 378. Putting the question of Wexford's policies to one side for now, the court simply addresses the second

13

evidentiary hurdle: whether Sterling has presented sufficient "verifying medical evidence" to establish that the delay in treatment was detrimental to him. *Liefer*, 491 F.3d at 714–15.

Even with all reasonable inferences granted in his favor, Sterling has not satisfied this threshold requirement of his § 1983 claim. Wexford's failure to proceed with the angiogram "at some point," as recommended by Dr. Gordon, may be disappointing, but Sterling has not offered evidence from which a reasonable jury could find that the delay in cardiac treatment caused him any harm rising to the level of an Eighth Amendment violation. In his summary judgment brief, Sterling asserts without explanation that his "medical records alone establish his claims and demonstrate he was harmed by Wexford's inaction." (Pl.'s Br. at 13.) But Sterling does not point to any specific injury reflected in these records. Although there is little evidence of the exact treatment he received while in Wexford's care (or the rationale behind that treatment), a "bare recitation of treatment received" is not adequate to establish deliberate indifference. *See Liefer*, 491 F.3d at 715. Sterling promises that he could "provide testimony to a jury about the stress and concern he had for his well-being after having to wait almost two years to be seen by a cardiologist." (Pl.'s Br. at 13.) But these allegations need factual support now—not just at a theoretical future trial. A party opposing summary judgment is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss*, 816 F.3d at 916. Sterling has not set a basis for a reasonable jury to conclude, without substantial speculation and conjecture, that the delay "exacerbated [his] condition or otherwise harmed him." *See Grieveson*, 538 F.3d at 779.

The cases Sterling cited differ in that the plaintiffs in those cases offered greater evidence of a constitutional harm. The plaintiff in *Petties*, who suffered from a ruptured Achilles tendon, "provided corroborating medical evidence that the delay had a detrimental effect on his condition through [a second doctor's] treatment notes, which indicate [plaintiff] was suffering pain and gapping at the rupture site due to the lack of immobilization" by the first doctor. *Petties*, 836 F.3d at 732. That plaintiff also submitted an affidavit stating that "without a splint, he had nothing to

keep his ankle from moving around, which made him feel 'constant, severe pain' whenever he got up to walk, and made sleeping difficult." *Id.* In *Liefer*, the plaintiff claimed that his pain and high blood pressure were unnecessarily prolonged by an hours-long delay in proper medical attention. *Liefer*, 491 F.3d at 712–13. The court, holding that the plaintiff had presented enough evidence to overcome summary judgment, noted that "[t]he medical records indicate that the nitroglycerin almost immediately relieved his pain and lowered his blood pressure, so a jury could find that the defendants' delay caused [the plaintiff] six extra hours of pain and dangerously elevated blood pressure for no good reason." *Id.* at 715–16. The plaintiff in *Gil v. Reed*, who alleged that a physician's assistant had denied him a prescribed medication, "presented evidence that within 24 hours of taking the [initially denied] antibiotic he began to feel better." 381 F.3d 649, 662 (7th Cir. 2004). Likewise, the plaintiff in *Goodloe v. Sood* "testified that he experienced instant pain relief" after he was eventually given the medical attention that he alleged had been unreasonably denied. 947 F.3d 1026, 1029 (7th Cir. 2020).

Sterling, in contrast, has provided no evidence from which a reasonably jury could conclude that the delay in cardiac care "exacerbated [his] condition or otherwise harmed him." *See Grieveson*, 538 F.3d at 779. His promises of future evidence are insufficient to overcome summary judgment.

## II.    *Monell* Liability

### A.    Legal Principles

As explained above, the court finds no genuine dispute of material fact about whether Sterling was deprived of his Eighth Amendment rights. Even if Sterling had adequately shown an Eighth Amendment violation related to the delay in his cardiac treatment, the court concludes that Wexford would be entitled to summary judgment because he has failed to establish Wexford's liability under the *Monell* standard.

In *Monell*, the Supreme Court held that a municipal government is a "person" subject to damages under 42 U.S.C. § 1983. *See Monell*, 436 U.S. at 690–91. The Seventh Circuit has

15

extended *Monell* to § 1983 claims brought against "private companies acting under color of state law." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). This means that although municipalities and government contractors like Wexford are not immune from constitutional tort liability, plaintiffs who bring § 1983 claims against them must challenge conduct that is "properly attributable" to the defendants themselves. *First Midwest Bank*, 988 F.3d at 986. *Respondeat superior* liability is unavailable. *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 790 (7th Cir. 2014).

A plaintiff must prove three distinct but closely related elements to succeed under *Monell*. First, the plaintiff must identify conduct "properly attributable" to the defendant itself. *Brown*, 520 U.S. at 404. "A municipal action can take the form of an express policy (embodied, for example, in a policy statement, regulation, or decision officially adopted by municipal decisionmakers), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality." *J.K.J.*, 960 F.3d at 377. According to the Seventh Circuit, "[t]he central question is always whether an official policy, *however expressed* (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation. It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Glisson*, 849 F.3d at 379 (emphasis added).

Second, the plaintiff must establish that the defendant's action—i.e., the policy, practice, or final policymaker's decision identified above—was the "moving force" behind the plaintiff's injury. *J.K.J.*, 960 F.3d at 377 (quoting *Brown*, 520 U.S. at 404). This requirement of a "direct causal link" between the defendant's action and the plaintiff's injury ensures that the defendant is held liable only for its own conduct, not for "a one-time negligent administration of [a policy] or factors peculiar to the officer involved in a particular incident." *See Dean*, 18 F.4th at 236 (quoting *Brown*, 520 U.S. at 407–08). "The critical question . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 382.

Third, the plaintiff must prove that the defendant's action—i.e., the policy, practice, or final policymaker's decision identified above—reflects "the requisite degree of culpability" by the defendant. *J.K.J.*, 960 F.3d at 377 (quoting *Brown*, 520 U.S. at 404). For a deliberate indifference claim, that means the defendant's action (in whatever form it takes) must reflect the defendant's conscious disregard of a "an excessive risk to inmate health or safety." *See Farmer*, 511 U.S. at 837.

**B.     Application**

As the court understands his brief, Sterling makes two related *Monell* arguments. As explained here, on this record, neither is sufficient to survive summary judgment.

First, Sterling says that Wexford lacks any "mechanism by which recommendations for follow-up specialty care made by a board-certified specialist, like Dr. Gordon, are guaranteed to be considered by Wexford through the collegial review process." (Pl.'s Br. at 9.) As a result, he contends, "there was no way of ensuring that recommendations by other medical professionals made their way into the collegial review process," and inmates "have no opportunity to have their medical needs examined during the collegial review process." (*See, e.g.*, Pl.'s Br. at 11.) That "gap in policy," Sterling argues, caused Dr. Gordon's recommendation to be ignored and Sterling to be harmed. The court notes first that this "gap in policy" framing slightly distorts the record. As a matter of express policy, Wexford personnel review an inmate's updated medical records and exercise their independent clinical judgment in determining whether a recommendation for offsite treatment, like Dr. Gordon's, should advance to collegial review. (*See* Def.'s SOF ¶¶ 15, 21, 28, 58, 75.) It is thus incorrect to say that, as a matter of Wexford's express policy, inmates "have no opportunity to have their medical needs examined during the collegial review process." (*See* Pl.'s Br. at 11.) What Sterling attacks is not Wexford's express policy itself but rather what he contends is a widespread practice of failing to carry out the express policy properly. In his view, the possibility that a recommendation like Dr. Gordon's will advance to collegial review may be

illusory, as Wexford staff members do not properly exercise their independent clinical judgment when reviewing such recommendations.

Sterling has not presented enough evidence to prove that such a practice exists (or that it can be attributed to Wexford). Sterling repeatedly points out that "Wexford cites no documentary evidence that Dr. Gordon's recommendation was ever considered or followed-up upon." (Pl.'s Br. at 4.) But even if one grants Sterling the inference that Dr. Gordon's recommendation was completely ignored by Wexford's medical personnel, Sterling has shown only that Wexford's express policy was not followed properly in *his* case. To hold Wexford liable for that single failure would violate *Monell*'s proscription on *respondeat superior* liability in § 1983 claims. Sterling needed more evidence to establish the existence of a corporate practice "properly attributable" to Wexford and, derivatively, to establish the causal link between that corporate practice and his injury. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event."). For the same reason, he has failed to establish Wexford's culpability—i.e., its deliberate indifference to the risks of its alleged practice. *Cf. Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 967 (7th Cir. 2019) ("Wexford's knowledge that some referrals slipped through the cracks is not the same as Wexford's knowledge that constitutionally necessary referrals were not happening with such frequency that it ignored an obvious risk of serious harm.").

In his second *Monell* argument, Sterling cites the Contract between Wexford and IDOC and argues that Wexford has an implicit policy or widespread practice of elevating financial considerations over questions of medical need. (*See, e.g.*, Wexford–IDOC Contract § 2.2.2; *see also* Pl.'s Br. at 12.) In support of this theory, Sterling notes that Wexford has admitted that it "prefer[s] that certain services be performed at UIC because of a long-standing relationship" between UIC and IDOC. (Def.'s SOF ¶ 70.) For example, "UIC has a holding cell in the facility that accommodates certain security concerns, and it is a university hospital that is clinically

equipped to handle difficult cases with a greater variety of techniques." (*Id.*) Consistent with this relationship between the two institutions, the Contract provides that, for some medical services (including coronary angiograms), Wexford may refer an inmate to UIC at no cost to Wexford. (Def.'s SOF Reply ¶¶ 54–54.) By itself, of course, this contract provision would contradict Sterling's theory, as it tends to suggest that Wexford had a financial incentive to refer Sterling out for the treatment that Sterling alleges he was denied. Sterling attempts to rebut that inference by pointing to the Contract's annual cap on the number of no-cost referrals that Wexford can make to UIC, above which IDOC may reduce Wexford's compensation. (*See* Wexford–IDOC Contract §§ 2.2.3.7(b), 3.9.3(g); *see also* Def.'s Add. SOF Resp. ¶¶ 28–29.)

These provisions of the Contract do not constitute an express "cost-cutting" policy, as they do not dictate how Wexford should make treatment decisions (with respect to costs or otherwise). (*See, e.g.*, Pl.'s SOF Resp. ¶ 71 (admitting that "[a]s a part of the contract, Wexford agrees to provide any necessary services for the inmate's health care"); *id.* ¶ 76 (admitting that "[n]othing in the contract dictates how Wexford medical providers should provide treatment to inmates")).) At most, the provisions are circumstantial evidence that financial incentives bear on Wexford's decision-making in a way that could potentially prevent necessary care from being provided. But Sterling has not introduced evidence sufficient to conclude that this incentive has materialized in the form of the cost-cutting practice that he alleges. For one thing, Sterling has no evidence that "cost-cutting" caused his own lack of cardiac treatment. And the only evidence that has been presented regarding the systemic effect of the Contract provisions contradicts Sterling's cost-cutting theory: Wexford has exceeded the annual number of referrals to UIC on numerous occasions, but its compensation has never been reduced. Without more, the court finds that Sterling has not introduced evidence from which a reasonable factfinder could conclude that Wexford maintains or enforces a policy of denying or delaying treatment because of cost-cutting considerations—nor, by extension, has he introduced evidence to show that Wexford was deliberately indifferent to the risks that such a policy posed.

Plaintiffs in the cases cited by Sterling made much more compelling showings of policies or practices resulting in constitutional violations. In *Dixon*, for instance, the mother of a deceased pretrial detainee alleged that her son did not receive prompt palliative care for his lung cancer. Specifically, she alleged that the jail's records policy "led inexorably to inadequate medical care for inmates" because it resulted in poor communication among the jail's various providers. *Dixon v. County of Cook*, 819 F.3d 343, 347–48 (7th Cir. 2016). In addition to targeting the express records policy, the plaintiff introduced indirect evidence of (1) the causal link between the deficient policy and the delay in her son's palliative care, and (2) the county's deliberate indifference to the risks posed the deficient policy. Reversing a grant of summary judgment for the county, the Seventh Circuit acknowledged that the plaintiff had to show that the county's issues were "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision" of deliberate indifference to the records policy's risks. *Id.* at 348 (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)). This standard was met, the court concluded, because the plaintiff had cited testimony from a prison doctor about issues he routinely faced in accessing patient medical records and testimony from a Department of Justice investigator about systemic recordkeeping issues in the prison. *Id.* at 348–49.

In *Daniel*, a plaintiff detainee alleged that, due to various systemic problems, a jail's health care staff had caused permanent damage to his hand and wrist by failing to remove his cast promptly and failing to provide adequate physical therapy. The Seventh Circuit explained that "[t]o prove an official policy, custom, or practice within the meaning of *Monell*, Daniel must show more than the deficiencies specific to his own experience, of course." *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016). "When seeking to rely upon indirect proof, he must come forward with evidence that could allow a reasonable trier of fact to find . . . 'systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system.'" *Id.* at 734–35 (quoting *Dixon*, 819 F.3d at 348). The plaintiff was also required to present evidence "that a policymaker or official knew about these deficiencies and failed to correct

them." *Id.* at 735. Plaintiff Daniel did so, offering "extensive deposition testimony from Jail staff" about the jail's practices and citing documents from a prior federal investigation of the jail's health care system, which "prove[d] notice and the apparent absence of a response" by the jail. *Id.* at 736; *see also Davis*, 452 F.3d at 692–93 (summarizing evidence of defendant's systemic failure to provide timely methadone treatment to inmates); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 297–98, 303–04 (7th Cir. 2010) (describing testimony from policymakers that defendant had a widespread practice of ignoring detainees' medical requests).

Sterling has not introduced the kind of evidence found sufficient in *Dixon or Davis*. As the Seventh Circuit recently emphasized, the *Monell* doctrine requires a showing of more than "the isolated wrongdoing of one or a few rogue employees" and instead requires "more widespread practices." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). Sterling has not made that showing. Even if he had proven that he had suffered a constitutional deprivation (which he has not done), Sterling has not introduced evidence from which a reasonable factfinder could conclude that the "moving force" behind any injury he suffered was a policy or practice that is "properly attributable" to Wexford. *See Brown*, 520 U.S. at 404; *J.K.J.*, 960 F.3d at 377 (quoting *Brown*, 520 U.S. at 404).

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [161] is granted.

ENTER:

Dated: December 13, 2021

_____
REBECCA R. PALLMEYER
United States District Judge